# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES CORMAN, ENERGY
ALTERNATIVE STUDIES, INC. AND
THE ENERGY ALTERNATIVE STUDIES
INC. HEALTH AND WELFARE PLAN,
        **Plaintiffs,**

    **v.**

THE NATIONWIDE LIFE INSURANCE
COMPANY,
        **Defendant.**

CIVIL ACTION

NO.  17-3912

## MEMORANDUM OPINION

John Koresko was the mastermind behind a large-scale endeavor to convert welfare benefit funds to his own use, which has spawned years of litigation.  *See generally Perez v. Koresko*, 86 F. Supp.3d 293 (E.D. Pa. 2015); *Solis v. Koresko*, 884 F. Supp.2d 251 (E.D. Pa. 2012), *aff'd*, 646 F. App'x 230 (3d Cir. 2016).

Following the revelation of the scheme, Plaintiffs James Corman, Energy Alternative Studies, Inc. ("EAS"), and the Energy Alternative Studies Inc. Health and Welfare Plan (the "EAS Plan") filed a complaint in August 2017 against Defendant Nationwide Life Insurance Company ("Nationwide"), which was dismissed without prejudice.  *Corman v. Nationwide Life Ins. Co.*, 347 F. Supp.3d 248, 258 (E.D. Pa. 2018).  Plaintiffs filed an Amended Complaint to which Defendant has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Amended Complaint alleges that Defendant: (1) breached its fiduciary duty and engaged in prohibited transactions in violation of Section 1132(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"); (2) knowingly participated in fiduciary breaches and in prohibited transactions in violation of Section 1132(a)(3) of ERISA; (3) conducted the affairs of an enterprise through a pattern of racketeering activity in violation of Section 1962(c) of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"); (4) benefited from the RICO violations of Koresko and his associates in violation of Section 1962(c) of RICO under a *respondeat superior* theory of liability; and, (5) violated Section 1962(d) of RICO by conspiring to violate Section 1962(c) of RICO. For the reasons that follow, the motion will be denied.

## I.    BACKGROUND

Before addressing the facts themselves, a preliminary question arises: Which facts and documents may be considered in resolving this motion to dismiss? As a general rule, courts may consider "documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the complaint, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *see also Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (on motion to dismiss, consideration may be given to "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents"). The Third Circuit has explained that "[t]he rationale underlying this [rule] is that the primary problem raised by looking to documents outside the complaint [is] lack of notice to the plaintiff," and that this problem "is dissipated where the plaintiff has actual notice and has relied upon these documents in framing the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

In Defendant's prior motion to dismiss, it attached two documents central to this case: the "Plan Documents," which established the welfare benefit plan at issue here, and the "Policy," which insured Plaintiff James Corman and his wife Mary Corman's lives. Defendant did not, however, attach these documents to its currently pending motion to dismiss. Noticing this discrepancy, the Court ordered the parties to show cause why the Court should not take judicial

notice of the documents submitted with the initial motion to dismiss. While ultimately not dispositive to the pending motion, the Court concludes based on the parties' responses that the Plan Documents and the Policy may appropriately be considered, for several reasons.

First, the documents are "undisputedly authentic," *Mayer*, 605 F.3d at 230, insofar as when they were attached to the prior motion to dismiss, Plaintiffs did not contest their authenticity. And here, Plaintiffs offer no argumentation to suggest otherwise.

Second, these documents are "integral to the complaint." *Buck*, 452 F.3d at 260. The "integral" criterion is met where "the claims in the complaint are 'based' on an extrinsic document." *Burlington Coat Factory*, 114 F.3d at 1426. Plaintiffs state that their claims are not "based" on the documents because the documents are "referenced to establish the confusion, ambiguity, and false impressions created by them." Plaintiffs' contention is partly true; the Complaint certainly does allege some confusion relating to the documents. But the Amended Complaint also "base[s]" its ERISA claims on the supposition that Defendant breached its fiduciary duties by engaging in actions not authorized by the terms of the Plan Documents or the Policy (including, as will be discussed at length below, issuing an unauthorized loan). Therefore, the documents are sufficiently "integral" to the Amended Complaint that they may be considered here.

Third, these documents are "items appearing in the record of the case." *Buck*, 452 F.3d at 260. Plaintiffs, in response, largely rely on *Hoefling v. City of Miami*, 811 F.3d 1271 (11th Cir. 2016), an Eleventh Circuit decision that held that a district court, when ruling on a motion to dismiss a second amended complaint, had erred by considering documents attached only to the first amended complaint. The panel explained: "[W]hen [the plaintiff] filed the second amended complaint, the first amended complaint (and its attached exhibits) became a legal nullity." *Id.* at

1277.  But that case does not govern here primarily because the *Hoefling* court's reasoning was

based on the plaintiff having "expressly disavowed or rejected" the previously attached exhibit in

question—whereas here Plaintiffs' Amended Complaint continues to rely on the documents in

question.  In any event, to the extent *Hoefling* counsels differently from *Buck*, persuasive

Eleventh Circuit authority must give way to binding Third Circuit precedent.

 Fourth, Plaintiffs were on notice that these documents were central to their claims and

that they could be relied upon in resolving the motion to dismiss.  Plaintiffs aver otherwise—but

do not offer any affirmative argument to support that position.  Regardless, Plaintiffs are

mistaken: The Amended Complaint quotes the Plan Documents extensively and makes repeated

and extensive reference to the Policy, making plain that Plaintiffs did have notice that they could

and would be relied upon in resolving this motion to dismiss.  Therefore, the Plan Documents

and Policy are appropriately considered in resolving this motion to dismiss.

 In addition to the Plan Documents and Policy, two more documents—one entitled

"Verification of Trust and Warrant of Authority" ("the Verification") and another referred to by

the parties as the "Custodial Agreement"—are central to this case.  These documents are not

attached to any of the parties' briefs or pleadings, but they are excerpted and otherwise described

in the Amended Complaint.  These excerpts and descriptions are part of the factual allegations of

the Amended Complaint, and therefore they may be considered in resolving the pending motion.

*See Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 37 n.1 (3d Cir. 2018) (citing *Schmidt

v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014)) ("To the extent passages are excerpted from

documents not attached to the complaint, we consider them because the documents were integral

to and explicitly relied upon in the complaint."); *see also Badillo v. Stopko*, 2012 WL 1565303,

at *5 (D.N.J. May 2, 2012) (considering, on a motion to dismiss, excerpts of a document that was

a part of the underlying complaint even though the document itself was not attached to the complaint, because "portions of [the document] are quoted at length" and because "Plaintiffs' claims rely on it").

### A. The Arrangement

Between 2002 and 2013, John Koresko and others operated a multiple employer welfare arrangement (the "Arrangement" or the "Koresko Arrangement") that allowed employers to purchase cash value life insurance policies and take a tax deduction for the premiums as a business expense. Koresko systematically converted and misused the assets of the participating welfare benefit plans, which was described extensively in *Perez*, *supra*.

As relevant here, the Arrangement was run by PennMont Benefit Services ("PennMont"), a corporation whose officers included John Koresko and his brother Lawrence Koresko (throughout this opinion, unless otherwise noted, "Koresko" refers to John). PennMont recruited participants and administered the individual plans, including the Plaintiff EAS Plan. In its recruitment materials, PennMont explained to prospective participants that in order to take advantage of the Arrangement's purported tax benefits, an employer needed to sign an adoption agreement that established the employer's own welfare benefit plan according to terms dictated by Koresko. Employers, including Plaintiff EAS here, then paid insurance premiums into a trust, and a trustee passed those payments on to insurance companies, including Nationwide. As a general rule, the trustee—not the insured—was the owner and beneficiary of the policies, although the Plan Documents (which established the plans) stated that the plans and the trust were to be managed for the exclusive benefit of the insureds and that contributions made to the plans would be used to pay the life insurance premiums.

## B.  The Parties' Relationship with the Arrangement

The EAS Plan was a plan participating in the Arrangement; EAS was the sponsoring employer; and James Corman was a participant in the EAS Plan whose life (and whose wife's life) was insured by the Policy purchased through the Trust and issued by Defendant Nationwide. Plaintiffs joined the Arrangement in early 2000, at which time the Policy was purchased from Nationwide.  From the time the Policy was purchased, EAS contributed $865,000 to pay premiums to the Trust and the Trustee passed those payments on to Defendant.

According to the Amended Complaint, the relationships among these parties were governed by the Plan Documents, the Policy, the Verification, and the Custodial Agreement.

The Plan Documents established the EAS Plan, and stated that insurance policies purchased under the Plan and the cash value contained in those policies "shall be owned by the Trustee."  The Plan Documents also granted wide-ranging authority to the Trustee to control those policies:

> The Trustee may purchase Policies on each Participant. . . .  The policy shall be a contract between the Trustee and the Insurer and shall reserve to the Trustee all rights, options and Benefits provided by the Policy and permitted by the Insurer, except that the right to name and change the Beneficiary shall be exercised . . . in writing pursuant to a power of attorney or other document.

The Policy, although it insured the Cormans' lives, made clear that it was "a legal contract between the Owner [the Trustee of the Plan] and Nationwide," that "all rights in [the] Policy belong to [the Owner]," and that the Owner "may assign any or all rights under [the] Policy."

While it is not entirely clear from the Amended Complaint who the Trustee was during the first two years of Plaintiffs' participation in the Arrangement,[1] on or around April 15, 2002

---

[1] The Amended Complaint at times suggests that the Trustee during that period was Farmers & Merchants Trust Company, but at other points the Amended Complaint suggests that this was not the case.

Community Trust Company ("CTC") became the Trustee.[2]  The Amended Complaint also alleges that on or around March 20, 2002—that is, before CTC became Trustee—CTC "executed" the Verification, which designated Jeanne Bonney, a Koresko associate, as "Appointed Signator" on behalf of CTC with "authority to sign Arrangement-related documents on behalf of CTC."  The Verification further stated:

> The trust empowers the trustee to exercise any and all rights associated with owning life insurance policies and the trustee can exercise these rights without the consent of the insured.  These rights include but are not limited to: surrendering the policy, withdrawing policy values, borrowing against the policy, transferring ownership, and changing the beneficiary.

CTC also "executed" a document entitled "Custodial Agreement," which purported to "designate[] the Koresko Law Firm as CTC's agent and gave the firm possession of the 1200 insurance policies CTC was to own as trustee" for benefit of the employer welfare benefit plans within the Arrangement—including the Policy issued by Defendant on James and Mary Cormans' lives.  The "Custodial Agreement" also gave the Koresko Law Firm the same "powers listed in the Verification, *i.e.,* the authority to change ownership and beneficiaries of the insurance policies, surrender policies, and remove cash value through withdrawals or policy loans," and also "[p]urported to release the Koresko Law [F]irm from any liability other than liability arising from 'willful or gross negligence[.]"

The Custodial Agreement and the Verification were both executed before CTC became Trustee on April 15, 2002, and both documents were provided to Defendant at some point after March 20, 2002.  The allegations of the Amended Complaint are that Nationwide knew that the Verification was invalid and knew that the Custodial Agreement was incompatible with the Plan

---

[2] It is also unclear whether the Amended Complaint alleges that, upon becoming the Trustee, CTC also became the "beneficiary" of the Plan.  The Amended Complaint alleges both that CTC functioned as the "owner and beneficiary of the polic[y] f/b/o [for benefit of] the [EAS Plan]," Am. Cmplt. ¶¶ 39, 100, and that it simply owned the policies "as trustee f/b/o the polic[y] f/b/o the [EAS Plan]," *id.* at ¶ 82.

Documents and the trust agreement.

Later that year, according to the Amended Complaint, Koresko or one of his associates instructed Nationwide, based on the purported authority of the Verification, to "change the name of the owner/beneficiary . . . to REAL VEBA TRUST DATED 3/20/95." According to the Amended Complaint, knowing that Koresko lacked the authority to make the changes, Nationwide followed these instructions.

Sometime in 2009, Koresko requested that Defendant make eight loans to him secured against the cash value of various policies in the Arrangement, including a loan for $578,777.52 collateralized by Plaintiffs' Policy, which was made on August 26, 2009. The loan requests were made by Koresko "the individual" in the "purported role of director-trustee of Penn Public Trust," who signed the loan applications as "Director – Trustee." When Koresko requested the loans, he also submitted to Defendant "an affidavit signed by Koresko that asserted that CTC no longer existed as the result of a merger into F&M [Farmers & Merchants Trust Company] and that F&M was subsequently removed in favor of Penn Public Trust as Trustee[,]" and that Koresko "had the right to request the loan as the 'sole Director of Penn Public Trust.'" The loans were made to "Single Employer Welfare Plan C O Pennmont Benefit SRVC."[3]

Three months after the loan secured by Corman's Policy was requested, and then at least one more time after that, Plaintiffs requested information from Nationwide and Koresko-affiliated entities about the status of the Policy—but Nationwide did not respond. Accordingly, Plaintiffs did not learn of the 2009 loan until much later—sometime in mid-2014. Plaintiffs filed this lawsuit on August 31, 2017.

---

[3] None of these documents were attached to the Amended Complaint, thus the allegations in the Amended Complaint as to what they say are taken as true for purposes of the pending motion to dismiss.

## II.     LEGAL STANDARD

To overcome a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In determining whether a complaint satisfies this standard, a court must first outline the required elements, then strip away legal conclusions from the complaint, and finally decide whether the well-pled factual allegations plausibly entitle the plaintiff to relief. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). Further, it bears noting that the Third Circuit has recently held that heightened pleading standards applicable in antitrust cases that require plaintiffs to plead conduct beyond that which is consistent "with a wide swath of rational and competitive business strategy," *Twombly*, 550 U.S. at 554, do not apply to ERISA plaintiffs. *Sweda v. Univ. of Pa.*, 923 F.3d 320, 326 (3d Cir. 2019) (declining to require a plaintiff "to rule out every possible lawful explanation for the conduct he challenges") (internal quotation marks omitted).

## III.    ANALYSIS

### A.  ERISA Claims

Plaintiffs bring claims under both Section 1132(a)(2) and Section 1132(a)(3) of ERISA. The underlying reason for the dismissal of Plaintiffs' ERISA claims in the previous complaint was that Plaintiffs had failed to plead facts supporting Nationwide's fiduciary status. Plaintiffs have amended that deficiency. A discussion of fiduciary status and Plaintiffs' amended allegations provides the framework to address each of Defendants additional arguments as to

why the ERISA counts should be dismissed.

i.  <u>The Amended Complaint Alleges that Nationwide was a Fiduciary</u>

As relevant here, an entity is a fiduciary for purposes of ERISA to the extent it "exercises any discretionary authority or discretionary control respecting management of [the] plan[.]"  29 U.S.C. § 1002(21)(A).  Discretionary authority cannot be established by showing "mere custody or possession over plan assets . . . without more."  *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 347 (3d Cir. 2004).  Rather, the purported fiduciary must exercise "undirected" authority or control.  *Srein v. Frankford Trust Co.*, 323 F.3d 214, 221-22 (3d Cir. 2003).  And, because Plaintiffs allege various distinct activities that could constitute violations of a fiduciary's duties under ERISA—including changing the policy beneficiary and trustee without authorization and issuing the loan on Corman's Policy to Koresko—it is important to note that fiduciary status is "not an all or nothing concept"; an entity may exercise discretionary control and thus maintain fiduciary status for one activity but lack control and status for another.  *Id.* at 221.

This key question—whether Plaintiffs have alleged that Defendant exercised "discretionary control"—has already been addressed once in this case.  *Corman*, 347 F. Supp.3d at 254-55.  In their initial complaint, Plaintiffs had not adequately alleged discretionary control as to either changing the name of the trustee or as to issuing the loan in question.  The Court explained that although Plaintiffs asserted in their briefing that Nationwide exercised fiduciary control over the cash value of the Plan because "(1) Nationwide knows it did not pay out the loan funds to CTC because CTC did not exist at the time the loan was made; (2) Nationwide actually paid the loan proceeds to Single Employer Welfare Plan C O Pennmont Benefit SRVC; and (3) Nationwide did not even inform CTC or its successor, F&M, that the loan was requested or made," Plaintiffs faced the "threshold problem" that "[t]hey ha[d] not pleaded these facts in their

Complaint." *Id.* at 255 n.6.

Now, however, Plaintiffs do plead facts that support their assertion that Defendant exercised "discretionary control." The two key changes between the first motion to dismiss and the currently pending motion to dismiss are as follows. First, in the briefing on the first motion to dismiss, the parties did not direct the Court's attention to the fact that CTC "executed" the Custodial Agreement and Verifications on March 20, 2002—several weeks before the Amended Complaint alleges that CTC became the Trustee on April 15, 2002. Second, the initial complaint did not contain the allegation that Koresko represented himself as "Director – Trustee" and took out the loan on the Policy as an "individual."[4]

Applying those changes, the Amended Complaint has adequately pleaded that Defendant exercised "discretionary control" as to the activities of changing the owner or trustee of the Plan and as to issuing the loan. It alleges that the Trustee for the EAS Plan purchased from Defendant the Policy insuring Plaintiff Corman's life in early 2000, and that the Trustee of the Plan "owns" the Plan and thus possesses "all rights in [the] Policy." It also alleges that on about March 20, 2002, CTC executed the "Custodial Agreement," which purported to designate the Koresko Law Firm as CTC's agent, and the "Verifications," which purported to give Koresko associates the authority to change the owner of the Plan. But it separately alleges that CTC was not the Trustee of the Plan on March 20, 2002—CTC only became Trustee on April 15 of that year. Therefore, the Amended Complaint plausibly states that the Custodial Agreement and Verifications were invalid, that Koresko and his associates had no authority to instruct Nationwide to change the

---

[4] It is also worth noting that while the complaints at issue in the *Corman* decisions are similar in many respects to the complaint filed and ruled on in *Hausknecht* another case spawned by the Koresko scheme*, see Hausknecht*, 334 F. Supp.3d at 669, they are distinct cases decided in response to distinct litigation positions and strategies adopted by the respective defendants. Most importantly, in *Hausknecht* the defendant attached various documents to its motion to dismiss that the Court could appropriately consider, including forms documenting the transfer in trustee and agency authority, *see Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), but here the documents have not been attached either to the Complaint or to the motion to dismiss.

name of the owner or beneficiary of the Plan, and that Nationwide had no authority to effectuate such a change. As a result, Nationwide exercised discretionary control by changing the owner and trustee when it had not been instructed by an authorized person to do so.

Similarly, the Amended Complaint adequately pleads that Nationwide was a fiduciary with respect to issuing the loan. In addition to pleading that the Custodial Agreement and Verifications were invalid, the Amended Complaint also states that Koresko took out the loan in his own name, signing as "Director – Trustee." Therefore, even assuming the Custodial Agreement and Verification were valid, the loan could not have been issued because it was not requested by an entity authorized by those documents (the Custodial Agreement and Verification only conferred authority on Jeanne Bonney and the Koresko Law Firm). And of course, to the extent that the documents were invalid, the Koresko Law Firm also lacked legal authorization to take out the loan against the Policy. Consequently, Nationwide exercised discretionary authority by allowing a stranger to the policy—Koresko—to do so. In sum, taking the facts in the Amended Complaint as true, Nationwide should not have changed the owner of the policy—but did, and should not have issued the loan to Koresko—but did. In doing so, it exercised "discretionary control."

Nationwide's arguments to the contrary are unavailing. It points to the Plan Documents' statements that any policy purchased "shall be owned by the Trustee" and "shall be a contract between the Trustee and the Insurer," and the Policy's language that "[t]he Owner has all rights under [the] Policy." Relying on those passages, Nationwide contends that it had no basis to refuse the Custodial Agreement and Verifications executed by CTC to change the owner and beneficiary of the Policy, and no basis to refuse Koresko's request for the loan. But this argument only holds water if the Amended Complaint fails to plausibly allege that the Custodial

Agreement and Verifications were invalid. Assuming they are invalid—as has been adequately alleged—then the requests to change the owner/beneficiary and to issue the loan were made by third parties who were strangers to the Plan and the Policy, not by the Owner. Consequently, the requests could have been refused by Nationwide. And even if valid, the Custodial Agreement and Verification did not purport to give authority to Koresko as an individual. Therefore, the Amended Complaint pleads that the issuance of the loan was prohibited by the terms of the Policy and the Plan Documents, and as a result Nationwide's arguments must fail.[5]

        ii.  <u>Statute of Limitations</u>

ERISA actions ordinarily must "be commenced . . . after the earlier of" either "six years after . . . the date of the last action which constituted a part of the breach or violation" or "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113. Under that general rule, the parties agree that Plaintiffs' claims would be time-barred because the latest action potentially constituting an ERISA violation (the $578,777.52 loan) occurred on approximately August 26, 2009 (eight years before Plaintiffs filed their Complaint), and Plaintiffs acknowledge they developed knowledge of the violation no earlier than mid-2014 (more than three years before they filed the Complaint)—meaning that the earlier of the two possible limitations dates, approximately August 26, 2015, had passed by the time Plaintiffs filed their initial complaint on August 31, 2017.

However, the statute contains an exception: "[I]n the case of fraud or concealment," an ERISA action "may be commenced not later than six years after the date of discovery of such breach or violation." *Id.* To trigger this "fraudulent concealment exception," a defendant must

---

[5] Defendant also argues that "even assuming that . . . the portion of the Custodial Agreement that purportedly transferred ownership of plan assets is somehow 'invalid and illegal' . . . Plaintiffs allege no plausible facts to suggest that the entire Custodial Agreement is invalid. This contention fails because the Amended Complaint alleges that CTC was without authority to sign the Custodial Agreement at all, thus plausibly alleging that the entire document was invalid.

have taken "affirmative steps," to hide the breach of duty. *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1552 (3d Cir. 1996).

Here, the parties diverge. Plaintiffs contend that the "affirmative step" Defendant took was—after having issued the loan to Koresko—failing to respond to Plaintiffs' "inquiries" as to the "status of the policy." Defendant, on the other hand, argues that the terms of the Policy did not permit it to share information with Plaintiffs.[6] Deciding this issue ultimately turns on whether Defendant was permitted (or even obligated) to respond, because disregarding such an obligation could be considered an act; but refusing to provide the information could not be considered an affirmative act if the Policy expressly prohibited Defendant from providing it.

Defendant was required to respond because "circumstances known to [a] fiduciary can give rise to [an] affirmative obligation [to communicate to the beneficiary] even absent a request by the beneficiary." *Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc.*, 93 F.3d 1171, 1181 (3d Cir. 1996). "The duty to disclose material information is the core of a fiduciary's responsibility," *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993), and it must be exercised "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use[,]" 20 U.S.C. § 1104(a)(1)(B). Facts must be disclosed that are "known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection." *Glaziers and Glassworkers*, 93 F.3d at 1182. Here, Defendant

---

[6] Defendant does not appear to contest that, assuming the ability to furnish information existed, the refusal to respond to Plaintiffs' queries would constitute "affirmative steps." And indeed, a party's failure to provide accurate or complete information that it was required to provide may satisfy the fraudulent concealment doctrine. *See Bulger*, 243 F.3d at 788-89 (noting that where defendants "thwarted" plaintiff's efforts to "gain access to information about the operations of the [p]lan," the court could "not as a matter of law [find] that no fraud or concealment occurred"); *Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 204 (3d Cir. 2006) (explaining that "responding to questions in a manner that diverted the beneficiary from discovering a prior misrepresentation could make the 'fraud or concealment' exception applicable").

processed a loan requested by a stranger to the Policy (Koresko); a fact that a "prudent person" would have known was "material," and that the beneficiary needed to "know for its own protection."[7]  And once it is established that such a duty existed, it becomes evident that the Amended Complaint alleges that Defendant engaged in an "affirmative act" intended to "exclude suspicion" by shirking it.  *See Kurz*, 96 F.3d at 1552; *Montrose Med. Grp. Participating Savs. Plan v. Bulger*, 243 F.3d 773, 788 (3d Cir. 2001).  An affirmative act can be as simple as "responding to questions in a manner that diverted the beneficiary from discovering a prior misrepresentation."  *Ranke*, 436 F.3d at 204 (describing *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 505 (3d Cir. 2001)).  Here, the allegations in the Amended Complaint are that Nationwide "excluded suspicion" by refusing to provide requested information that the beneficiary needed to know "for its own protection."  This allegation is sufficient, at the motion to dismiss stage, to invoke the fraudulent concealment exception to the statute of limitations.

Defendant's arguments to the contrary are unavailing.  Primarily, Defendant contends that it had no choice whether to issue the loan and whether to respond to Plaintiffs' queries, and therefore that it exercised no fiduciary control with respect to either issuing the loan or providing responsive information to Plaintiffs.  But taking the Amended Complaint as true, Defendant's position is unavailing.  As already discussed, the Policy did not require Defendant to issue a loan to a stranger of the Policy, nor did it require Defendant to, after having issued the loan, refuse to

---

[7] While, as noted *supra* note 2, the Amended Complaint is not entirely clear as to who the beneficiary of the Policy was (the Trustee or the Plan), that lapse is immaterial for purpose of this question because the Amended Complaint alleges that Defendant informed neither CTC nor the Plan of the loan.  To the extent CTC was the beneficiary, Nationwide did not comply with its "affirmative obligation" to communicate, *Glaziers & Glassworkers*, 93 F.3d at 1181, and to the extent the Plan was the beneficiary, the Amended Complaint alleges that, in addition to reneging on its "affirmative obligation," Defendant did not respond to the Plan's request for information.

provide information that would reveal it had done so.[8]

Defendant also relies heavily on the district court opinion in *Nagy v. DeWese*, 771 F. Supp.2d 502 (E.D. Pa. 2011), but the negative implications of that case bolster Plaintiffs' position, not Defendant's. That is because *Nagy* relied on the fact that there was no "nexus between the subject of the disclosure . . . and the activities that give rise . . . to fiduciary status," *id.*, but here, there is a direct nexus between authorizing a loan to a stranger of the Policy and failing to disclose that loan either to the insured or to the Trustee.

Finally, Defendant argues that even if it took "affirmative steps" in breaching its fiduciary duty to disclose material information about the illegal loan it had authorized, that failure triggered the statute of limitations in late 2009 when Plaintiffs first requested information from Defendant about the status of the Policy. Under the doctrine of fraudulent concealment, "[t]he statute of limitations is tolled until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment." *Bulger*, 243 F.3d at 788. According to Defendant, after Plaintiff asked about the Policy and did not receive an answer, "reasonable diligence" would have led Plaintiffs to discover the concealment. Taking the Amended Complaint in the light most favorable to Plaintiffs, Plaintiffs exercised reasonable diligence. The Amended Complaint offers no reason for Plaintiffs to have believed in 2009 that a fraudulent loan had been issued. It does not follow from Defendant's failure to provide information about the status of the Policy—even if Plaintiffs believed that information should have been forthcoming—that Plaintiffs necessarily had notice that an unwarranted loan had been taken out against the Policy or that anything was amiss beyond a failure to respond to the

---

[8] To the extent that Defendant argues that even if it should not have issued the loan, the Policy did not obligate it to communicate with Plaintiff, Defendant misses the point. The obligation to communicate flows from Defendant's fiduciary status created by its exercise of discretion in issuing the unauthorized loan—in other words, this requirement is imposed by ERISA itself, not by the Policy.

request.  In any event, "reasonable diligence," both generally, *see, e.g.*, *Bell Telephone Labs.,*

*Inc. v. Hughes Aircraft Co.*, 564 F.2d 654, 656 (3d Cir. 1977), and specifically in the fraudulent

concealment context, *see, e.g.*, *Workman v. A.I. DuPont Hosp. for Children of Nemours Found.*,

2007 WL 2173395, at \*3 (E.D. Pa. July 27, 2007), is a question of fact.  Reading the Amended

Complaint in the light most favorable to Plaintiffs, it pleads sufficient facts to survive a motion

to dismiss.

Therefore, the fraudulent concealment exception applies and the ERISA counts will not

be dismissed on timeliness grounds.

### iii.   Defendant's Arguments that it Followed the Terms of the Plan

Defendant also argues that Plaintiffs' ERISA claim under Section 1132(a)(2) fails on the

merits.  To state a claim under Section 1132(a)(2), a plaintiff must plead that (1) a fiduciary, (2)

breached a duty, and (3) losses to the plan resulted from the breach.  29 U.S.C. §§ 1132(a)(2);

1109(a); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 252 (1993); *Hansen v. Int'l Painters*

*& Allied Trades Indus. Pension Plan*, 2017 WL 4539217, at \*12 (E.D. Pa. Oct. 11, 2017).

Defendant first argues that it was not a fiduciary.  As already noted, under ERISA, an

entity is a fiduciary if it is either named as such in the plan, 29 U.S.C. § 1102(a)(2), or, as

relevant here, to the extent it "exercises any discretionary authority or discretionary control

respecting management of [the] plan," *id.* § 1002(21)(A).  *See also Mertens*, 508 U.S. at 252.  As

Defendant is undisputedly not named as a fiduciary in the plan, the parties spar over the

discretionary control that Defendant exercised.  In support of its position, Defendant relies on the

assertion that the Policy itself does not provide for Defendant to exercise any discretionary

control.  But, as discussed at length *supra* Section III.A.i, this argument misunderstands the

thrust of Plaintiffs' Amended Complaint.  Plaintiffs do not contend that the Policy—or any other

document—authorized Defendant's actions; rather, the underlying argument Plaintiffs assert is that Defendant "exercise[d] . . . discretionary control" *in defiance of* the Policy's strictures. That is, Plaintiffs assert that Defendant used its discretion by ignoring the Policy's terms when Defendant allowed a stranger to the Policy to take a loan against the Policy.

Second, Defendant argues that, even if it was a fiduciary, it did not breach any fiduciary duty. Under ERISA, as informed by the common law of trusts, *see Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985), plan fiduciaries are subject to a range of specific duties characterized variously as including a duty of loyalty, a duty to take action only for the exclusive benefit of the beneficiary, a duty to disclose certain information, a duty to act with the "care, skill, prudence and diligence" of a "prudent" person, and a duty to act in accordance with the documents governing the plan. *See* 29 U.S.C. § 1104(a)(1); *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 415-16 (3d Cir. 2013); *Glaziers & Glassworkers*, 93 F.3d at 1179-82. Defendant's argument as to why it did not breach a fiduciary duty is essentially the same as its argument as to why it is not a fiduciary at all: It claims that the Amended Complaint does not "allege there was anything wrong with the processing of the loan by itself." For the reasons already discussed—the Amended Complaint alleges that the loan was processed in contravention of the Plan Documents at the request of a stranger to the plan, which clearly amounts to a breach of the duty to act as a "prudent" person, among other duties—this argument fails.

Third, Defendant argues that its alleged conduct did not cause any loss to the plan. It asserts that the loss was caused by "Koresko's conversion of plan assets for his personal use, not [Defendant]'s processing of a valid loan request by a party with authority to make such a request." But, as with its arguments addressing fiduciary status and fiduciary duty, Defendant

assumes that the loan request itself was valid—an assumption that, taking the Amended Complaint as true, is inappropriate at this stage.

### iv.  Claim for Equitable Relief

Claims brought under Section 1132(a)(3) of ERISA may only seek equitable relief, *see Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361 (2006), and Defendant argues that Plaintiffs' claim must fail because it seeks legal, rather than equitable, relief.  Under the Section 1132(a)(3) Count, Plaintiff requests:

1. [Defendant] be ordered to:
   a. Make full restitution of all losses stemming from the conversion of the cash value of the insurance policy purchased f/b/o the EAS WBP;
   b. Disgorge or make restitution of all fees, commissions or any other form of compensation paid or profits made in violation of § 406 of the Act [29 U.S.C. § 1106]; and
   c. Make full restitution of all profits that the EAS WBP would have earned on the converted funds;

2. [Defendant] be ordered to treat the insurance policy on Mr. Corman's life as if the loan had never been taken.  More specifically, [P]laintiffs request that [Defendant]:
   a. Forgive all indebtedness related to the Max Loan;
   b. Credit to the [P]olicy's cash value the income that would have been earned between 2009 and the present by the funds removed via the Max Loan; and
   c. Calculate future premiums and maturity dates based on cash value credits required by the relief requested in (a) and (b) above[;]

3. Plaintiffs be awarded attorney's fees and costs; and

4. The Court award such other equitable relief as it deems appropriate.

This Court's reasoning in *Hausknecht* controls.  As this Court explained in *Hausknecht*, "[t]he usual distinction between an equitable and legal remedy is whether the recovery is sought against 'some specific thing . . . rather than . . . a sum of money generally.'  334 F. Supp.3d at 677 (quoting *Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 658 (2016)).  As to restitution in equity, such relief may be available "where money or property identified as belonging in good conscience to the plaintiff [can] clearly be traced to

particular funds or property in the defendant's possession." *Id.* (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)) (emphasis omitted). In *Hausknecht*, the plaintiffs requested identical relief for its Section 1132(a)(3) count as Plaintiffs here request for their Section 1132(a)(3) count—with the exception of paragraph 2 above. This Court concluded, on the one hand, that the *Hausknecht* plaintiffs "identified a specific asset—Defendant's rights to repayment of the loans it disbursed from the Policy—that yields a 'specific block of money.'" *Id.* at 678 (quoting *Sackman v. Teaneck Nursing Ctr.*, 86 F. App'x 483, 485 (3d Cir. 2003)). But, on the other hand, the Court concluded that the rest of the request for relief in *Hausknecht* under the Section 1132(a)(3) count—that is, the request for "disgorgement of fees, commissions, or compensation of profits"—was not cognizable because there was no reason to believe those fees could be "traced to specifically identifiable funds in [the defendant]'s possession." *Id.* (citing *Knudson*, 534 U.S. at 214). This Court therefore concluded that the Section 1132(a)(3) claim would be dismissed "except to the extent it seeks restitution of the Policy value." As to the parts of the request for relief here that are identical to the request for relief in *Hausknecht*—that is, paragraphs 1, 3, and 4—the same conclusion holds here.

As for the relief sought in Paragraph 2—the request that Defendant "be ordered to treat the insurance policy on Mr. Corman's life as if the loan had never been taken"—it survives for the same reason that the request for restitution of the Policy value survives: It is not for a "sum of money generally." *Montanile*, 136 S. Ct. at 657. Rather, it is a request for Plaintiffs' Policy, which is held "in [Defendant's] possession," *id.*, to be restored to the state in which it had existed before Defendant's allegedly wrongful actions. Therefore, Paragraph 2 of Plaintiffs' requested relief under the Section 1132(a)(3) claim survives as well.

### B. RICO Claims

Plaintiffs contend that Defendant is both directly and vicariously liable under RICO, and Defendant argues that both contentions fail for various reasons.

#### i. Direct Liability

To adequately plead a violation of 18 U.S.C. § 1962(c), Plaintiffs must allege "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct of the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity." *United States v. Parise*, 159 F.3d 790, 794 (3d Cir. 1998) (internal quotation marks omitted). And to plead a violation of 18 U.S.C. § 1962(d), which covers conspiracies to violate RICO's substantive provisions (18 U.S.C. §§ 1962(a)-(c)), Plaintiffs must allege "an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 373 (3d Cir. 2010) (internal quotation marks omitted).[9]

Defendant does not challenge in their motion to dismiss that the Amended Complaint fails on all prongs; rather, it argues that Plaintiffs have not adequately pled a "pattern of

---

[9] Defendant argues that all of Plaintiffs' RICO claims are barred by the statute of limitations. The statute of limitations for RICO claims is four years. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). The statutory period runs from the date that Plaintiffs "knew or should have known of their injury," and "kn[ew] or should have known of the source of their injury." *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004) (citing *Forbes v. Eagleson*, 228 F.3d 471, 485 (3d Cir. 2000)). Defendant argues that Plaintiffs "should have known" about the injury and the source thereof prior to August 31, 2013—four years before the initial complaint was filed—because Plaintiffs had inquired with Defendant about the "status of the policy" prior to that date. The Amended Complaint states that in response to the inquiries, Defendant did not "provide any meaningful information." This argument fails for the same reason the Court concluded previously that Plaintiffs have pleaded they exercised "reasonable diligence" in the ERISA context: The Amended Complaint offers no reason for Plaintiffs to have believed in 2009 that a fraudulent loan had been issued and Defendant's failure to provide useful information about the status of the Policy did not necessarily give Plaintiffs notice that the value to them of the Policy may have been diminished by an unauthorized loan. While further factual development may lead to the conclusion that Plaintiffs "should have known" more at the time, taking the Amended Complaint as true, the Court cannot come to such a conclusion at this stage in the litigation. *See* supra Section III.A.i.

racketeering activity." That pattern is defined by statute as "requir[ing] at least two acts of racketeering activity," 18 U.S.C. § 1961(5) (commonly referred to as "predicate acts"), and "racketeering activity," also defined by statute, includes unlawful welfare fund payments under 18 U.S.C. § 1954, and embezzlement crimes under 18 U.S.C. § 664. *See id.* § 1961(1). *See also H.J. Inc. v. Nw. Bell Telephone Co.*, 492 U.S. 229, 242 (1989) (demonstrating that each predicate act need not target the plaintiff). Plaintiffs' Amended Complaint adequately alleges that Defendants are directly responsible for multiple violations of Section 664.

As with the arguments about Defendant's fiduciary status in the ERISA context, some of the arguments the parties make here have already been addressed once, when the Court granted Defendant's motion to dismiss the initial complaint. In that opinion, the Court concluded that Plaintiffs had not pleaded facts showing that the various loans were unauthorized or otherwise wrongfully issued. *Corman*, 347 F. Supp.3d at 256. But, as with the ERISA claims, the newly pleaded facts in the Amended Complaint change the result here—in short, because Plaintiffs have now pleaded that the loans were requested by a stranger to the plans, they can establish the "pattern of racketeering activity" that they were unable to establish before.

Section 664 prohibits, at the very least, "(1) the unauthorized (2) taking or appropriation (3) of benefit plan funds." *Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp.2d 502, 508 (E.D. Pa. 2001) (citing *United States v. Andreen*, 628 F.2d 1236, 1231 (9th Cir. 1980)). Plaintiffs allege in their Amended Complaint that making the eight loans to Koresko secured by various policies in the Arrangement constituted violations of Section 664. Defendant's argument to the contrary, that the Amended Complaint pleads no basis on which Defendant could have refused the loan requests, is unavailing for the reasons discussed *supra* Section III.A.i. The Amended Complaint not only adequately pleads that the Custodial Agreement (which, according to Plaintiffs, allowed

the Koresko Law Firm to sign for the Trustee) was invalid, but that even if it had been valid, that the Custodial Agreement did not make John Koresko the Trustee. Therefore, taking the Amended Complaint as true, Defendant engaged in an unauthorized taking of funds by honoring a request by a stranger to the Plan to take out loan on the Policy.[10]

### i. Vicarious Liability

Plaintiffs also contend that Defendant is vicariously liable for Koresko's RICO violations under principles of agency and *respondeat superior*. Defendant argues that the claim fails as a matter of law for two reasons: (1) It asserts that liability under Section 1962(c) can only exist where a defendant "actively" engages in criminal conduct; and, (2) It asserts that even if *respondeat superior* liability were cognizable, it is limited to the employer/employee relationship, rather than the principal/agent relationship that Plaintiffs allege. Both arguments are unavailing.

In *Petro-Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349 (3d Cir. 1987), the Third Circuit held that *respondeat superior* liability is a viable theory under Section 1962(c). Defendant, however, does not grapple with *Petro-Tech*, and instead directs the Court to *Reves v. Ernst & Young*, 507 U.S. 170 (1993), a Supreme Court opinion that does not address *respondeat superior* liability. Rather, *Reves* interpreted the language of 1962(c)—making it unlawful "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity"—as requiring a liable party to "participate in the operation or management of the enterprise itself." 507 U.S. at 185. Defendant argues that *Reves* "makes

---

[10] Plaintiff also asserts that Nationwide engaged in predicate acts by violating the anti-kickback provisions of 18 U.S.C. § 1954. Defendant responds largely by raising fact-specific questions as to whether certain payments were "bona fide," *see United States v. Baroni*, 909 F.3d 550, 578 (3d Cir. 2018), or by raising arguments solely in its reply brief and thus waiving them, *see D'Aiuto v. City of Jersey City*, 2007 WL 2306791, at *4 n.1 (D.N.J. Aug. 8, 2007); *see also Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994). However, having established that the Amended Complaint pleads sufficient predicate acts based solely on Section 664, the Court need not reach the merits of the parties' arguments relating to Section 1954.

clear that a defendant will not be held vicariously liable under Section 1962(c) unless it played a central role in the alleged misconduct or benefitted from it." Whether or not *Reves* significantly narrowed *Petro-Tech*, even under Defendant's own interpretation of the cases (which tracks with the interpretation of many courts to have considered the issue), a party can be vicariously liable if it "benefitted from" the misconduct. *Petro-Tech*, 824 F.2d at 1961; *see also Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002); *Davis v. Mut. Life Ins. Co. of N.Y.*, 6 F.3d 367, 379 (6th Cir. 1993). And Plaintiffs have adequately pleaded that Defendant benefited from the racketeering activity by generating increased sales, interest on the allegedly illegal loans, premium payments, and reducing the death benefits it would ultimately be required to pay.[11]

Defendant also argues that vicarious liability is limited to the employer/employee context. But it cites no case to support this proposition.[12] While most cases addressing vicarious liability do occur in the employer/employee context, no court appears to have explicitly contemplated that the theory would be limited to that context. And because *respondeat superior* typically applies to broader principal/agent relationships, *Meyer v. Holley*, 537 U.S. 280, 285-86 (2003) ("It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."), it would be inappropriate to artificially narrow its application in this

---

[11] Defendant also relies heavily on the district court opinion in *Salvador v. Mazzocone*, 686 F. Supp. 528 (E.D. Pa. 1987), for the proposition that a liable entity's role must have been "active[.]" But, as *Salvador* predates *Petro-Tech*, the district court did not have the benefit of the Third Circuit's declaration that vicarious liability is a viable theory.

[12] Defendant notes that the "only case that [it] could find that address[es] the question of vicarious RICO liability in the context of an insurer/broker relationship stands for the . . . proposition . . . that RICO claims against insurers based on vicarious liability for the actions of brokers will be dismissed." That case, *Pinski v. Adelman*, 1995 WL 669101 (N.D. Ill. Nov. 7, 1995), aside from being a nearly 25-year-old district court opinion, hardly stands for the proposition for which Defendants cite it. *Pinski* is merely a case where the district court dismissed a claim for vicarious liability based on a complaint's failure to plead sufficient facts—not based on any reasoning or even suggestion that the underlying claim was nonviable, nor on the supposition that such vicarious liability claims should categorically be dismissed. *Id.* at *14.

particular context.

For the foregoing reasons, the motion to dismiss will be denied.

An appropriate order follows.

**July 11, 2019**                                    **BY THE COURT:**

                                                      **/S/WENDY BEETLESTONE, J.**

                                                      _____
                                                      **WENDY BEETLESTONE, J.**