**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES CORMAN, ENERGY ALTERNATIVE STUDIES, INC. AND THE ENERGY ALTERNATIVE STUDIES INC. HEALTH AND WELFARE PLAN, | CIVIL ACTION |
| Plaintiffs, | |
| v. | NO.  17-3912 |
| THE NATIONWIDE LIFE INSURANCE COMPANY, | |
| Defendant. | |

**O P I N I ON**

Plaintiffs James Corman, Energy Alternative Studies, Inc. ("EAS") and the Energy Alternative Studies Inc. Health and Welfare Benefit Plan ("EAS Plan") contend that Defendant the Nationwide Life Insurance Company ("Nationwide") violated two sections of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2)-(3), and two sections of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)-(d), by taking certain actions as the insurer of life insurance policies which were devalued through a larger, complex scheme to swindle funds from welfare benefit plans operated by one John Koresko.

Plaintiffs now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on their ERISA claims, and Defendant cross-moves for summary judgment on Plaintiffs' ERISA and RICO claims.  For the reasons that follow, both Parties' Motions shall be granted in part and denied in part.

## I.  BACKGROUND

This story arises from a complex scheme run by John Koresko and his affiliates to steal tens of millions of dollars from hundreds of welfare benefit plans.  In the decade of litigation

following the discovery of this scheme, the focus of these suits has shifted from Koresko to the insurers which provided life insurance policies used in the welfare benefit plans.  Plaintiffs are some of Koresko's victims and contend that Defendant Nationwide was in on Koresko's scheme.  Specifically, Plaintiffs contend that Defendant was an ERISA fiduciary because it exercised undirected control by changing the owner of the life insurance policy on Plaintiff James Corman's life as well as issuing a loan on said policy, and that Defendant breached such fiduciary duties.  Plaintiffs also argue that Defendant was part of a RICO enterprise with Koresko and his cohorts.

To follow the narrative, one must be familiar with the myriad characters involved and the roles they played.  Plaintiff James Corman owns Plaintiff Energy Alternative Studies, Inc. ("EAS").  He established a welfare benefit plan, the Energy Alternatives Studies, Inc. Health and Welfare Benefit Plan ("EAS Plan")—also a Plaintiff in this case.

To run this arrangement and perpetrate his fraud, Koresko established several entities.  These entities included the Regional Employers' Assurance Leagues ("REAL")—a loose, unincorporated association of unrelated employers through which Koresko offered to employers his program of employee welfare benefit plans and benefits.  Koresko also established two trusts, the Regional Employers Assurance League Voluntary Employees' Beneficiary Association Trust ("REAL VEBA Trust") and the Single Employer Welfare Benefit Plan Trust ("Single Employer Trust").  Four different entities, First Union National Bank ("FUNB"), Community Trust Company ("CTC"), Farmers & Merchants Trust Company ("F&M") and Penn Public Trust ("PPT"), served as the two Trusts' trustees in that order.  The last of these trustees, PPT, was established and owned by Koresko.  Koresko also founded, owned and served as the director of PennMont Benefits Services, Inc ("Penn-Mont"), which served as the administrator for each

2

employer's plan, including the EAS Plan.  Finally, Koresko founded and wholly owned two law firms—the Koresko Law Firm and Koresko & Associates, P.C.—which represented and took action on behalf of the other Koresko entities.

To join the arrangement, Corman and EAS executed several interrelated documents, [1] which consolidated power into the hands of John Koresko and his affiliates, including Penn-Mont and the trustee of the REAL VEBA and Single Employer Trusts.  These documents established and named Plaintiffs' welfare benefits plan, the EAS Plan, and referenced certain entities and persons involved in the management of the plan and the Koresko arrangement.  They named Koresko a fiduciary of the EAS Plan, authorized him to complete any documents on behalf of Corman which Penn-Mont determined to be incident to the EAS Plan, and provided that his signature alone could direct the Trustee to act in matters related to the Trusts and the EAS Plan.  These documents similarly authorized Penn-Mont to: (1) complete and execute any documents on behalf of Corman which it determined were related to the EAS Plan; (2) instruct the Trustee to act on behalf of the trusts and EAS; and, (3) solely delegate any and all fiduciary responsibilities under the trusts under its discretion.  The Trustee, which was FUNB at the time of execution, could take all manner of action on behalf of the Trusts at the direction of Penn-Mont, or Koresko.  Koresko and Penn-Mont thus held all the authority to take action on behalf of the EAS Plan and the Trusts, Corman with respect to matters pertaining to the EAS Plan, and could direct the trustee to exercise its powers to do their bidding.

Once the EAS Plan was established, life insurance policies were taken on the lives of plan participants though the trustee, then FUNB, which was named as the owner for the benefit

---

[1] These documents included (1) an "Adoption Agreement" which required Plaintiffs to adopt and agree to the "REAL Health and Welfare Plan Document"—a prototype plan document created by Koresko, and a Master Trust Agreement called the "REAL VEBA Trust Agreement" and, (2) an "Employee Participation Agreement."

of the welfare benefit plans. The Trust functioned as a pass-through vehicle, receiving insurance premiums paid by the employer and paying them to the insurance company for the policies. In this case, at Corman's request, a written application was submitted on behalf of the EAS Plan to Nationwide for a $5 million "last-to-die" life insurance policy on Corman's and his wife's lives (the "Policy" or the "Corman Policy"). The application listed the owner and beneficiary for the Policy as the "First Union National Bank, Trustee f/b/o Energy Alternative WBP C/o Penn-Mont Benefit Services, Inc" and its address as a King of Prussia P.O. Box. The application itself did not identify the trustee, but the signature line for the owner was stamped "First Union National Bank." The application also did not specify the role or relationship of Penn-Mont to the Policy or FUNB. Nationwide issued the policy on January 15, 2000.

Aside from John Koresko and his companies, two other individuals were key to his arrangement. The first is his brother, Lawrence Koresko,[2] who was the Vice President and part-owner of Penn-Mont and worked *inter alia* as an independent insurance broker at Koresko Financial, an insurance wholesaler he founded and jointly owned with his brother John.

The other key person involved in the execution of the Koresko scheme is Jeanne Bonney. She, like the Koreskos, held a variety of hats in the arrangement. The record indicates that she was an attorney employed by Koresko's two law firms, was affiliated with Penn-Mont and served as the Attorney in Fact for the REAL.

The final character in this story is the Department of Labor, which as mentioned *supra* sued the REAL VEBA Trust, the Single Employer Trust, Koresko, Bonney, CTC, and Koresko's law firms for violating ERISA by misusing funds from hundreds of welfare benefit plans. Ultimately, in February 2015, the Department of Labor prevailed in its lawsuit against Koresko

---

[2] Unless otherwise noted, "Koresko" as used in this opinion refers only to John Koresko.

and the other defendants in the action—who were determined to be ERISA fiduciaries of the employers' plans and found to have violated various provisions of the law by misusing plan funds, including by taking out loans exceeding $35 million on insurance policies.[3]  As relevant here, a loan in the amount of $578,777.52 was issued by Defendant on the Corman Policy, which loan has not been repaid and has continued to accrue interest in the 13 years since it was issued.

These characters, or the "who," are not the only piece to solving the puzzle of the case; the "what" and the "when" are also determinative.  Specifically, *who* or *what* entity owned the life insurance policy on Corman's life changed over time (at various points, Koresko and his cohorts told Defendant that the policy was owned by— "First Union National Bank, Trustee f/b/o Energy Alternative WBP C/o Penn-Mont Benefit Services, Inc," the Single Employer Trust and the four entities which served as trustees), as did *who* or *what* had the authority to make changes to the plan (those who claimed authority included, FUNB, CTC, PPT and Koresko) and to what extent of authority they represented themselves to have.  Further, when Defendant learned of *who* or *what* had *what* authority with respect to the policy is unclear from the record.

## II.     STANDARD OF REVIEW

To prevail at summary judgment, "the movant must show that 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'"  *Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992) (quoting Fed. R. Civ. P. 56(c)).  A factual dispute is material where it "might affect the outcome of the suit under the governing law. . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a genuine issue is present "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington*

---

[3] *See Perez v. Koresko*, 86 F. Supp.3d 293, 293-300 (E.D. Pa. 2015), *aff'd sub nom. Sec'y U.S. Dep't of Labor v. Koresko*, 646 F. App'x 230 (3d Cir. 2016).

*Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

The movant bears the initial burden of identifying those portions of the record "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Then, the non-moving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  Courts must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (internal citation omitted).

## III.   DISCUSSION

### a.   The ERISA Claims

Plaintiffs raise claims under two sections of ERISA—Sections 1132(a)(2), which provides for plaintiffs to obtain equitable relief and to recover damages from *fiduciaries* who breach their duties, *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007), and Section 1132(a)(3), which "authorize[s] suits against *any other person* who knowingly participates in a fiduciary's violations of her duties."  *See Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 90 (3d Cir. 2012) (internal citations, quotation marks and alterations omitted) (emphasis added).

#### i.   Plaintiffs' Section 1132(a)(2) Claim

Congress enacted ERISA "to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years." *Boggs v. Boggs*, 520 U.S. 833, 839 (1997).  Crafted to bring order and accountability to a system of employee benefit plans plagued by mismanagement and abuse, *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989), ERISA is principally concerned with protecting the financial security of plan participants and beneficiaries.  29 U.S.C. § 1001(b); *Boggs*, 520 U.S. at 845;

6

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).  Because of this remedial purpose, ERISA "should be liberally construed in favor of protecting the participants in employee benefit plans." *See IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986).

A pertinent illustration of ERISA's broad construction is that the term "fiduciary" is defined "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan . . . thus expanding the universe of persons subject to fiduciary duties—and to damages."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original) (internal citation omitted); *see also Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 413 (3d Cir. 2013) ("The definition of a fiduciary under ERISA is to be broadly construed.").  An entity is a fiduciary for purposes of ERISA if it is either named as such in the plan, or, as relevant here, if it exercises any "authority or control respecting management [of the plan] or disposition of [the plan's] assets." 29 U.S.C. § 1002(21)(A); *Srein v. Frankford Tr. Co.*, 323 F.3d 214, 221 (3d Cir. 2003).

A party will be found to be a fiduciary for exercising authority or control if it exercised "*undirected* authority and control" over plan assets—meaning that it did not act at the direction of a person or entity authorized to give such direction.  *Srein*, 323 F.3d at 221-22 (emphasis added).  "[M]ere custody or possession over plan assets, without more," is not enough to give rise to fiduciary status.  *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 347 (3d Cir. 2004).  In determining whether an entity is a fiduciary, it is crucial to keep in mind that it "is not an all or nothing concept. . . .  [A] court must ask whether a person is a fiduciary with respect to the *particular activity* in question."  *Srein*, 323 F.3d at 221 (emphasis added) (quoting *Maniace v. Com. Bank of Kan. City, N.A.*, 40 F.3d 264, 267 (8th Cir. 1994)).  Thus, Defendant may be a

7

fiduciary for one of the alleged acts of discretionary authority or control but lack fiduciary status for another.  Plaintiffs theorize that Defendant exercised undirected authority over the Policy and was thereby a fiduciary in three instances: when it changed the ownership of the Policy in 2002 and 2006, and when it issued a loan on the Policy in 2009.  Defendant disputes the facts underpinning each of the three claimed acts of undirected control or authority over the policy and also raises two threshold defenses—that (1) Plaintiffs' claims are time-barred; and, (2) its actions were ministerial and thereby cannot give rise to fiduciary responsibility.

### 1.  Statute of Limitations

Defendant's first argument that it contends estops any further inquiry and requires entry of summary judgment in its favor on the ERISA claims is that they are time-barred.  ERISA's statute of limitations provides that an action pertaining to a fiduciary's breach must be brought by the earlier of: (1) six years after the "date of the last action which constituted a part of the breach," or in the case of an omission, "the latest date on which the fiduciary could have cured the breach or violation"; or, (2) "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C. § 1113.  These limitations apply except in cases of "fraud or concealment" in which case an action may be commenced not later than six years after the discovery of the breach or violation.  *Id.*

Plaintiffs brought this action on August 31, 2017.  They contend their ERISA claims are timely under either provision because: (1) Defendant's annual interest charge on the 2009 policy loan is an action "which constitutes part of" Defendant's fiduciary breach, such that breach is ongoing and the statute of limitations clock has not yet run; and, (2) Plaintiffs had actual knowledge of Defendant's breach sometime in "mid-2014," when Corman received a policy statement indicating a loan had depreciated the policy from an independent fiduciary appointed

by the court presiding over the Department of Labor action, which would terminate the statute of limitations sometime in mid-2017.  In the alternative, Plaintiffs argue that the fraud or concealment applies to toll the operation of the statute of limitations to mid-2020—six years after they learned of the loan from the independent fiduciary.

In conducting the limitations analysis for Plaintiffs' ERISA claims, "[t]wo temporal determinations must [] be made: the date of the last action which formed part of the breach, and the date of the plaintiff's actual knowledge of the breach." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1178 (3d Cir. 1992).  Where an issue of fact precludes a determination as to either of these points, summary judgment must be denied.  *See, e.g.*, *Spear v. Fenkell*, 2016 WL 5661720, at *18-19, 19 n.20 (E.D. Pa. Sept. 30, 2016) (Lloret, M.J.).  In this case, neither Party has offered competent evidence as to when precisely Plaintiffs had actual knowledge of the "events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA." *Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO v. Murata Erie N.A., Inc.*, 980 F.2d 889, 900 (3d Cir. 1992); *Gluck*, 960 F.2d at 1177 ("'[A]ctual knowledge of a breach or violation' requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." (citations omitted)).

At best, all that can be discerned about Plaintiffs' knowledge of the issuance of the loan is that they learned that Defendant issued a loan in "mid-2014."  Neither Party, however, has offered any evidence to nail down the date, or explain what "mid-2014" means, or whether it renders the instant August 2017 suit timely.  Does "mid-2014" mean the second and third quarters of the year?  Does it refer only to the summer months?  Is "mid-2014" only the month of

June?  Or perhaps July?  We do not know.  As the statute of limitations is an affirmative defense, it is Defendant's burden to prove that it has run—a burden which it has failed to carry.  *See Williams v. Webb L. Firm, P.C.*, 2014 WL 3890358, at *8 (W.D. Pa. July 31, 2014).  Summary judgment on Plaintiffs' Section 1132(a)(2) claims therefore cannot be granted on the basis of untimeliness.[4]

## 2.  Ministerial Acts

Defendant next argues that it cannot be an ERISA fiduciary as a matter of law because its processing of the loan and change of ownership requests were "purely ministerial" in that these actions were not "initiated by" Defendant but were done at the request of another—irrespective of that person's authority to do so.  Defendant continues that a "mistake or miscomprehension about that authority" cannot transform ministerial functions into actions of discretionary authority or control.  It relies for this argument on a non-binding decision from which it pulls the proposition that "[t]he power to err . . . is not the kind of discretionary authority which turns an administrator into a fiduciary."  *IT Corp. v. Gen Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997).

Other cases cited by Defendant stand for the unremarkable proposition that when a non-fiduciary acts with regard to the plan's assets at the instruction of an authorized person, which actions include issuing checks from the plan's accounts, *Nagy v. DeWese*, 771 F. Supp.2d 502,

---

[4] Because there is an issue of material fact as to when Plaintiffs learned of Defendant's breaches, there is no need to resolve the question of when the last action or omission in Defendant's breach occurred.  *Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 201-03 (3d Cir. 2006) (determining when last action occurred under Section 1113(1)(A)).  Nor is there any need to determine whether Defendant's breach was "ongoing" based on the annual interest rate charge, *see, e.g.*, *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015), or whether the fraud or concealment exception applies to Plaintiffs' claims.  The juice derived from these questions is not worth the laborious squeeze of navigating the intricacies and esoterica of the ERISA statute of limitations.

513 (E.D. Pa. 2011), transferring funds, *In re Mushroom, Inc.*, 382 F.3d at 332,[5] or receiving deposits, *Bd. of Trs. of Bricklayers & Allied Craftsmen Loc. 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 275 (3d Cir. 2001), the non-fiduciary's actions do not transform it into a fiduciary.  In effect, *IT Corp.* distinguishes between clerical errors which do not create fiduciary status, and other kinds of mistakes which suggest a misjudgment that transforms the non-fiduciary into a fiduciary.  107 F.3d at 1421.  A manager of a welfare benefit plan who, at the instruction of a principal at the company, paid that principal more than he was entitled was an ERISA fiduciary despite acting at the instruction of the principal because the payment of the excess funds amounted to an "exercise [of] control over and dispos[al] of Plan assets."  *Id.* (internal quotation marks omitted) (quoting *Yeseta v. Baima*, 837 F.2d 380, 385-86 (9th Cir. 1988)).  An example of a clerical error, on the other hand, is "when a clerical employee types an erroneous code onto a computer screen" or errs in mailing a check.  *Id.*  Defendant's reading of these cases, to wit, that the importance of the task—not whether a change was made at the direction of an authorized person—is what determines whether a non-fiduciary can be held as a fiduciary in its execution is not correct.

A non-fiduciary acting at the direction of an authorized person, regardless of the importance of that act, presents a situation distinct from one where it acts for a stranger.  *See Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 334 F. Supp.3d 665, 673-74 (E.D. Pa. 2018) (citing *Srein*, 323 F.3d at 221).  When a non-fiduciary has no discretion under policy or plan document and acts at the behest of a person authorized under said document, it does not become

---

[5] Defendant advances a remarkably strained reading of *In re Mushroom*.  It argues that because "the Third Circuit did not even mention the issue" of the authority of the individual who instructed the defendant bank to distribute assets, the Third Circuit would find that the distribution of assets at the request of a stranger would not give rise to ERISA fiduciary status in *In re Mushroom*.  But Defendant has not demonstrated that there was any question as to the requesting person's authority, or even that this question was properly raised to the Third Circuit.

a fiduciary with respect to that authorized person's decisions. *Id.* In contrast, where a non-fiduciary acts at the request of a stranger to the plan's assets, it may be found to have exercised "undirected authority or control" over those assets. *See id.*; *Corman v. Nationwide Life Ins. Co.*, 396 F. Supp.3d 530, 545 (E.D. Pa. 2019). This is so even where the plan or policy document expressly provides that the non-fiduciary lacks discretion. That is because the execution of the stranger's request is made "*in defiance*" of that document's strictures. *Corman*, 396 F. Supp.3d at 545 (emphasis in original); *Srein*, 334 F.3d at 221 (holding that defendant was a fiduciary when it paid funds from a plan's investments to a stranger, though the plan documents provided that the defendant did not have any discretion with respect to investments); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 899 F. Supp.2d 310, 323-25 (E.D. Pa. 2012) (holding that the "performance of administrative and ministerial tasks by a mere custodian of plan assets does not amount to practical control" where the tasks "do[] not violate" the terms of the plan), *aff'd*, 725 F.3d 406 (3d Cir. 2013). Therefore, if Defendant is found to have changed the ownership of the Policy or issued the loan at the request of someone who did not have authority to take such acts on the Policy, it will be deemed a fiduciary with respect to those actions.

### 3. The 2002 Ownership Change

Plaintiffs' first argument that Defendant had a fiduciary duty and breached that duty is premised on a 2002 change of ownership of the Policy at the request of Penn-Mont from FUNB[6]

---

[6] There is no genuine dispute as to which entity owned the Policy prior to this request. Specifically, while Plaintiff contends that the owner was the "EAS WBP", they have failed to cite to evidence in the record which supports this position. Conversely, Defendant, in support of its contention that the owner was "First Union National Bank Ttee" cites to the Policy statement and correspondence between Defendant and Penn-Mont, both of which seem to confirm this to be the case. Given that Plaintiffs have not supported their contentions with citations to "particular parts of materials in the record. . . " there is no genuine dispute on this matter. Fed. R. Civ. P. 56(c)(1)(A); Policies and Procedures of the Honorable Wendy Beetlestone (July 2022), https://www.paed.uscourts.gov/documents/procedures/beepol.pdf (requiring Parties to make "specific citations to the joint appendix" in support of their positions as summary judgment).

to the REAL VEBA Trust.  The request noted that CTC, not FUNB, was the trustee.  As proof, it provided: (1) a "Notice to Insurer" which stated that CTC would become the trustee on April 15, 2002; and (2) a "Verification of Trust and the Warrant of Authority" ("First Verification") which affirmed CTC's authority as trustee and authorized Bonney to sign on behalf of the Trust.

Plaintiffs raise three arguments that the change was improper, contending that: (1) Penn-Mont lacked authority to make the ownership request because it was not an owner; (2) the First Verification is invalid, and it was improper for Defendant to rely on it to change the owner of the Policy because it was executed weeks before CTC assumed the position of trustee; and, (3) under Defendant's current policies for processing change of ownership requests, this request would not have been processed as it did not include all the requisite documentation.

Defendant admits that it made the change pursuant to the request, and that under its current procedures,[7] it would not have processed the request absent additional documentation. Defendant's only response to Plaintiffs' arguments regarding Penn-Mont's authority to make the request to change ownership is that "First Union resigned as trustee, which initiated the ownership change."  It does not otherwise respond to Plaintiffs' arguments regarding Penn-Mont's authority and the validity of the documents.  Defendant's failure to address Plaintiffs' arguments "constitutes abandonment" of the opportunity to contest summary judgment on that ground.  *See Seals v. City of Lancaster*, 553 F. Supp.2d 427, 432 (E.D. Pa. 2008) (citing *Hackett v. Cmty. Behav. Health*, 2005 WL 1084621, at *6 (E.D. Pa. May 6, 2005) (holding that a party's failure to address arguments waives the opportunity to contest summary judgment on those grounds)).  As Defendant does not challenge Plaintiffs' position that the first request was not

---

[7] Defendant was unable to establish its procedures on ownership changes in 2002—when the request was made—so instead provided discovery on its current procedures on ownership changes.

taken at the direction of an authorized person, Plaintiffs' Motion for Summary Judgment shall be granted on this issue—Defendant exercised undirected control and acted as fiduciary with respect to this first change in policy ownership.[8]

### 4.   The 2006 Ownership Change

Plaintiffs second theory of fiduciary responsibility stems from a second change in the ownership of the Policy in April 2006 from the REAL VEBA Trust[9] to the Single Employer Trust at the request of a Larry Townsend of Penn-Mont.  The Parties do not dispute that at the time of the request, CTC served as the trustee for both the REAL VEBA and Single Employer Trusts.

The change of ownership request form contained two signature blocks for the former owner—the REAL VEBA Trust—and the new owner—the Single Employer Trust.  It is not entirely clear who signed on behalf of either Trust as both hand-written signatures are illegible.  However, "CTC Trustee" is printed next to each signature.

To support the change of ownership request, Penn-Mont provided Defendant the first page of the Master Trust Agreement and a second document called "Verification of Trust and Warrant of Authority" ("Second Verification"), which Verification stated that CTC was the trustee of the Single Employer Trust and described CTC's authority over the Policy, which included the right to "transfer[] ownership."  It is undisputed that Defendant changed the ownership of the Policy upon this request.

---

[8] Neither of the Parties' briefs addresses whether this change amounted to a breach of Defendant's fiduciary duties. The question of whether Defendant breached its duties is thus beyond the scope of this Opinion.

[9] Plaintiffs again contend that the EAS Plan was the owner of the Policy, and that CTC made the request on its behalf.  They argue that CTC lacked authority to do so because "there is no indication that CTC ever agreed to or became trustee of the EAS WBP."  However, as explained *supra*, Plaintiffs have cited to no evidence which supports its allegation that the EAS Plan owned the Policy.

Plaintiffs argue that the Second Verification does not establish that CTC had authority to change the owner on the Policy on behalf of the REAL VEBA or Single Employer Trusts because the Second Verification is addressed to a third party known by the name of "Leaders Group"—not Defendant.  Plaintiffs contend that if the Second Verification is intended for that third-party, then it must be narrowly read to warrant CTC's authority *only* to that third-party; it should not be extended to warrant CTC's authority over the Policy to Defendant.  Plaintiffs, however, cite no legal authority in support of this argument and have thus waived it.  *See Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion such as the one made here . . . will be deemed waived.").

Plaintiffs' remaining arguments on the impropriety of this ownership change center around Bonney's authority to request this change.  It is not clear why Bonney's authority to request this change is at all relevant—Plaintiffs do not contend that she requested the change, nor does the request form or the accompanying documents identify her as having any role in the request.  On these arguments and record, Plaintiffs have failed to demonstrate that Defendant exercised undirected control or authority over the Policy in changing its ownership in 2006.  Defendant, on the other hand, makes no effort to argue that that this change was effectuated at the request of an authorized person.  Summary judgment shall therefore be denied for both Parties on Plaintiffs' Section 1132(a)(2) claim to the extent that it is premised on the second ownership change.

### 5.  The Issuance of the Policy Loan

Plaintiffs' final theory of fiduciary responsibility arises from Defendant's issuance of the Policy loan in 2009.  In August 2009, Koresko requested a loan in the "maximum loan amount available" on the Policy.  The terms of the Policy stated that the policy-owner "may request a

loan at any time while your Policy is in force."  The request listed the policy owner as the "Single Employer [] Trust, CTC Trustee" and was signed by Koresko.  Accompanying Koresko's signature was a stamp which represented that he was signing "for CTC Trustee Pres-Plan Admin. & Insured's Atty in Fact Signature and Authority Guaranteed."  Koresko submitted a package of documents—the Employee Participation Agreement, an affidavit, and two trust documents—to support the Policy loan application.  The Employee Participation Agreement appointed John Koresko, among others, as Corman's "Limited Attorney in Fact a power of attorney with respect to all matters connected with and/or related to the procurement and maintenance of benefits payable to [Corman] pursuant to REAL VEBA and the Employer's Welfare Benefit Plan."  The affidavit represented that CTC had merged with F&M, and that F&M had subsequently been removed and replaced by PPT—a company owned by Koresko.  Koresko was represented to be the director of PPT and having the authority to sign on behalf of "the Trust."  Based on these submissions, Defendant determined Koresko was authorized to request the loan, made the loan and issued $578,777.52 to "Single Employer Welfare Plan C/O Pennmont Benefit SRVC."

Plaintiffs argue that these documents did not authorize Koresko to take out the loan because: (1) the Employee Participation Agreement granted Koresko limited power attorney over Corman and did not appoint him as a limited attorney in fact for the owner of record—the Single Employer Trust; and, (2) F&M, not PPT, was trustee of the Single Employer Trust at the time of the request, so the affidavit and accompanying documents were invalid.  Plaintiffs also contend that under Defendant's internal loan procedures as of 2008 and 2021, Koresko's request would have been unacceptable and not been processed.

In response, Defendant neither disputes that the Employee Participation Agreement did

not appoint Koresko as a limited attorney for the policy owner—the Single Employer Trust, [10]

nor disputes that the request would have been unacceptable under its current procedures on

policy loans.  Rather, the Parties' dispute centers around the identity of trustee at the time of the

loan request and what to make of the fact that Koresko's request may have misrepresented it.  To

follow this dispute and understand the Parties' positions, one must be familiar with the

procedural history of the Department of Labor matter.  By way of background, in 2008 CTC

merged with F&M, which assumed the role of trustee for the Single Employer Trust and the

REAL VEBA Trust.  The next year, Koresko attempted to fire F&M as trustee.  The Department

of Labor moved for a temporary restraining order and preliminary injunction to prevent Koresko

from dismissing F&M from serving as trustee and installing his own company, PPT, in its

place.[11]  The Court held a hearing on the temporary restraining order on July 17, 2009,[12] at

which it received evidence that Penn-Mont had tried to remove F&M as the trustee on or about

July 6, 2009 and that the governing documents provided that the trustee would remain in power

for approximately 90 days after receiving notice of its removal.[13]  Following the hearing on the

temporary restraining order, the Court denied the Department's motion for a temporary

restraining order but reserved decision on the motion for a preliminary injunction.[14]  It then

requested that the parties submit a stipulation as to when this ninety-day period would expire,

---

[10] Indeed, Defendant concedes that it had rejected a loan requested by Koresko on the life insurance policy of another of his victims, which request relied upon that victim's Employee Participation Agreement.  The denial of that request explained, "[p]lease be advised that since [the life insured] is not the owner of this policy, his [power of attorney] does not give authority to the parties named in the POA (Penn-Mont and John J. Koresko, V. Esq.) to exercise any rights of ownership in this policy."

[11] *Solis v. Koresko*, 09-cv-0988 (ECF No. 63).

[12] *Solis v. Koresko*, 09-cv-0988 (ECF Nos. 64, 75).

[13] *Solis v. Koresko*, 09-cv-0988 (ECF Nos. 6, 75).

[14] *Solis v. Koresko*, 09-cv-0988 (ECF Nos. 71, 75).

which stipulation stated that the period would expire on October 5, 2009.[15]  Prior to the expiration of this ninety-day window, the court held four-days of hearings on the preliminary injunction[16] at which it ordered that Penn-Mont could not discharge F&M as Trustee of the REAL VEBA and Single Employer Trusts until a decision on the application for preliminary injunction had been rendered.  It thereafter (before the expiration of the ninety-day window), stayed Penn-Mont's discharge of F&M as trustee of the REAL VEBA and the Single Employer Trusts until it decided the government's motion.[17]  The stay on F&M's removal ran until well after the August 2009 loan on Corman's Policy was issued; F&M remained the trustee until January 15, 2010, when the Department of Labor's motion was denied, and PPT was permitted to become trustee.[18]

Defendant interprets this procedural history to mean that Koresko's loan request was not invalid for representing PPT as the trustee because PPT did ultimately become the trustee of the Single Employer Trust albeit some months after the request was made.  Plaintiffs, on the other hand, place import on the fact that PPT—no matter that it eventually became trustee— was not so at the time of the request.  And, from that, conclude that Koresko was not authorized to request the loan.  Neither Party, however, cites any legal authority to support their interpretation of this complex procedural history.  These arguments are thus waived.  *Reynolds*, 128 F.3d at 178.

Defendant also argues that Koresko had actual or apparent authority to take out a loan on the policy, but these arguments similarly stumble on procedure.  With respect to its argument

---

[15] *Solis v. Koresko*, 09-cv-0988 (ECF Nos. 73, 75).

[16] *Solis v. Koresko*, 09-cv-0988 (ECF Nos. 128-132).

[17] *Solis v. Koresko*, 09-cv-0988 (ECF No. 133).

[18] *Solis v. Koresko*, 09-cv-0988 (ECF Nos. 165, 191, 195).

regarding Koresko's actual authority, Defendant does not explain its position in its brief, instead directing the Court to look at the brief another insurance company, John Hancock, filed in a separate case stemming from Koresko's scam.  Defendant represents that Hancock "has already extensively briefed the issue of Koresko's actual authority to make the loan requests" which relied on "the same, generally applicable plan documents" so "there is no need to restate those same arguments."  To prevail on a motion for summary judgment, however, a party must argue its own case.  These arguments, made in a completely separate case, will not be considered because they are not part of the summary judgment record here.

Similarly, Defendant argues that Koresko had apparent authority to act on the policy owner's behalf because he was: (1) the "Attorney in Fact" for the REAL VEBA; (2) the secretary and a member of a "Committee" relating to the EAS Plan; (3) the President of Penn-Mont; (4) had been granted power of attorney by Corman; and, (4) "individually or through Penn-Mont" he served as the "constant and exclusive conduit for communications and instructions between the policy owner and Nationwide from the inception of the Policy through the time of the loan."  But, as Plaintiffs argue, "[t]hough Penn-Mont was constantly interacting with [Defendant], John Koresko's name does not appear in [the Corman Policy] file prior to the loan request."  Without some evidence which establishes that Defendant had reason to believe that Koresko had been authorized by the Single Employer Trust to act on its behalf, there can be no finding that he had apparent authority to request the loan.  *See Universal Comput. Sys., Inc. v. Med. Servs. Ass'n of Pa.*, 628 F.2d 820, 823-24 (3d Cir. 1980) (approaching the analysis from what Defendant knew or had reason to believe about the person's authority).

Neither Party has demonstrated that it is "entitled to a judgment as a matter of law" based on the record adduced and arguments advanced in their Motions.  Summary judgment shall

19

therefore be denied for both Parties on Plaintiffs' Section 1132(a)(2) claim to the extent that it is premised on the policy loan.

### ii.  Plaintiffs' Section 1132(a)(3) Claim

Turning next to Plaintiffs' alternate theory of non-fiduciary liability pursuant to Section 1132(a)(3) of ERISA—on which both Parties have filed competing Motions for Summary Judgment—this provision authorizes a "participant, beneficiary or fiduciary of a plan to bring a civil action" against *any person*, including non-fiduciaries, "to obtain appropriate equitable relief to redress violations of ERISA Title I." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) (internal citations and quotation marks omitted) ["*Harris Trust*"]. Section 1132(a)(3) has been interpreted to be a "catchall" provision which "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (internal quotation marks omitted).

Two key elements must be met before liability is imposed on a non-fiduciary pursuant to this Section.  First, there must be a plan fiduciary who had "actual or constructive knowledge of the facts satisfying the elements of a [prohibited] transaction, [and] caused the plan to engage in the [unlawful] transaction" and, second, the non-fiduciary must have "had actual or constructive knowledge of the circumstances that rendered the [fiduciary's] transaction unlawful." *Harris Trust*, 530 U.S. at 251.  In sum, there must be two actors, a fiduciary and a non-fiduciary, the latter of whom had constructive knowledge of the circumstances rendering the transaction unlawful before it can be held liable under Section 1132(a)(3).  In the instant case, Plaintiffs posit that Defendant is liable under Section 1132(a)(3) because Koresko and his affiliates were fiduciaries who engaged in a prohibited transaction and that Defendant had constructive

knowledge of the circumstances which made the loan unlawful.  Defendant counters that Plaintiffs' claim must fail because they have failed to demonstrate that it knew of Koresko's fiduciary breaches.[19]

Constructive knowledge has been interpreted to mean that the non-fiduciary "*should have known* of the existence of the trust and the circumstances that rendered the [action] in breach of the trust." *Harris Trust*, 530 U.S. at 251 (emphasis added); Restatement (Second) of Trusts § 297(a) (Am. L. Inst. 1959) (defining notice as when a person "knows or should know of the breach of trust").  In commentary, the Restatement further clarifies that a non-fiduciary should have known of the breach "when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust."  Restatement (Second) of Trusts § 297 cmt. a (Am. L. Inst. 1959).

A defendant "who is on notice that conduct violates a fiduciary duty is chargeable with constructive knowledge of the breach if reasonably diligent investigation would have revealed the breach."  *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 283 (2d Cir. 1992) (citing Restatement (Second) of Trusts § 297 cmt. a (Am. L. Inst. 1959)), *abrogated on other grounds by Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 322-23 (2d Cir. 2003).  If questions arise concerning an actor, like Koresko's, authority to act on the part of the trust, so too arises an obligation on the part of a defendant to determine whether that actor is so authorized to act.  *Id.*

---

[19] Defendant also argues that Plaintiffs have failed to demonstrate that the loan was a prohibited transaction. Plaintiffs contend to the contrary that making a loan to a "plan administrator is clearly a prohibited transaction" under Section 406 of ERISA, 29 U.S.C. § 1106.   These arguments, however, are not reached because, as explained above, there exists genuine issues of material fact regarding whether Defendant had constructive knowledge of a fiduciary's unlawful acts.

(citing *Whitney v. Citibank*, 782 F.2d 1106, 1116 (2d Cir. 1986)); *Corman*, 396 F. Supp.3d at

543.  And if reasonably diligent investigation would have revealed that said actor did not have

authorization to act, then the defendant can be charged with constructive notice of the

circumstances of the breach.  *Diduck*, 974 F.2d at 283.

      Under this standard, there are genuine issues of material fact as to whether Defendant had

constructive knowledge of the circumstances which made the loan on the Corman Policy a

prohibited transaction under ERISA.  As Plaintiff points out, there were inconsistencies in the

loan request and the supporting documentation as to whether the documentation provided

showed that Koresko was authorized to act on behalf the trustee.  It is not apparent why the

additional package of documents convinced Defendant that Koresko was authorized to take out

the loan, and whether it undertook a "reasonably diligent investigation" when making that

determination.  For example, though the request itself stated that Koresko was authorized to sign

as "CTC Trustee", the supporting documentation stated CTC no longer existed.  How, if at all,

did Defendant reconcile these conflicting statements?  The answer cannot be discerned from the

summary judgment record.  The Parties' cross-motions for summary judgment on Plaintiffs'

Section 1132(a)(3) claim shall therefore be denied.

      **b.  The RICO Claims**

      Plaintiffs raise three RICO claims—two of which are brought pursuant to Section

1962(c), 18 U.S.C. § 1962(c), and the third of which is brought under Section 1962(d). 18 U.S.C.

§ 1962(d).  For the following reasons only Plaintiffs' Section 1962(d) claim survives summary

judgment.

      Turning first to Plaintiffs' Section 1962(c) claims:  one is premised on Defendant's

directly liable for a RICO violation, and the others are for vicarious liability for the actions of the

two Koresko brothers and their various companies.  Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To maintain a claim for liability under Section 1962(c), Plaintiffs must demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010).

Plaintiffs' Section 1962(c) direct liability claim fails at the first element—conduct.  That is because they have not demonstrated that Defendant took "some part in directing the enterprise's affairs" which is necessary for a finding that it "conduct[ed] or participate[d]" in the conduct of the Koresko's enterprise under Section 1962(c).  *Reves v. Ernst & Young*, 507 U.S. 170, 178-79 (1993).  Direction can extend to the "lower rung participants" and "outsiders" in the enterprise" so long as they "exert control over [the enterprise]" and "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."  *Id.* at 184-85 (emphasis in original).  Services or goods provided by a third-party to the enterprise do not satisfy this requirement, regardless of how indispensable or valuable the service may have been, because they do not demonstrate that the defendant had "knowingly engage[d] in '*directing* the enterprise's affairs.'"  *See Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) (emphasis in original).  In sum, "[i]t cannot be said that by merely performing what are generic financial and related services . . . even if they are later found to be deficient, [a] [] firm has opened itself to liability under the federal racketeering statute."  *Id.* at 1539-40.  Indeed, there is consensus that Section 1962(c) claims against outside professionals providing important services to a racketeering enterprise do not constitute claims that these

professions directed the affairs of the enterprise.  *See, e.g.*, *Azrielli v. Cohen L. Offs.*, 21 F.3d 512, 521-22 (2d Cir. 1994) (provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise conducting the fraudulent transaction); *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*, 830 F. Supp. 257, 260 (E.D. Pa. 1993) (holding that even if appraiser's reports are "keystone" of the enterprise's perpetration of fraud, appraiser cannot be liable under Section 1962(c)); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994) (accountants were not liable because their involvement in enterprise's decision did not arise to direction because they neither made those decisions nor carried them out); *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) (providing legal services to an enterprise did not satisfy "operation or management" test); *Stone v. Kirk*, 8 F.3d 1079, 1092 (6th Cir. 1993) (sales representative did not participate in "operation or management" of the enterprise).

Plaintiffs contend that Defendant "was the provider of the product the enterprise was designed to sell; it was a collaborator and partner in the marketing scheme; in receiving premiums, paying commissions and administering the insurance policies sold, it played a substantial role in the continued administration of the enterprise; and, in approving or rejecting loan requests, it played a pivotal role in the conversions. . . ."  Plaintiffs also posit that Nationwide's role went beyond merely providing a policy because the plan documents incorporate the terms of the Policy, which provide that Nationwide has "ultimate control over whether and how death benefits are to be paid and the amount of the benefits."  Though Plaintiffs use a variety of verbs to describe what Defendant did, they do not provide competent evidence that Defendant *directed* or exercised control regarding the *enterprise's* affairs.  Even assuming that Defendant acted as Plaintiffs say it did—which Defendant disputes—these actions are more akin to a service provider whose support, though integral to the enterprise, does not provide the

24

basis for RICO liability.  Defendant's Motion for Summary Judgment on Plaintiffs' Section 1962(c) direct liability claim shall therefore be granted.

Plaintiffs' theory of vicarious liability under Section 1962(c)—premised on an argument that the Koreskos and their companies were Defendant's agents in selling its insurance products—fares no better.  The question of whether vicarious liability is a viable theory in a Section 1962(c) claim has been touched upon previously in this litigation.  Specifically, in Defendant's Motion to Dismiss, it argued that that there is no claim for vicarious liability under Section 1962(c).  But, it did not "grapple with" *Petro-Tech, Inc. v. W. Co. of N.A.*, 824 F.2d 1349 (3d Cir. 1987) ["*Petro-Tech*"], a Third Circuit decision which has to date not been explicitly overturned, which holds that Section 1962(c) permits claims to proceed on a theory of vicarious liability.  *See Corman*, 396 F. Supp.3d at 548-49.[20]  Now, Defendant argues that the reasoning underlying *Petro-Tech* was undermined by the Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) ["*Central Bank*"].  Defendant is correct—but understanding why, and why *Petro-Tech* is no longer good law, requires some familiarity with the contemporary history of statutory interpretation.

In *Petro-Tech,* the Third Circuit ruled that a RICO claim could be premised on theories of vicarious liability and aiding and abetting liability because these theories "advance[d] the goals of the particular federal statute which plaintiffs allege has been violated."  *Petro-Tech*, 824 F.2d at 1356.  In so holding, the Court relied on reasoning employed in a 1982 decision by the Supreme Court, which found that a principal could be vicariously liable for its agent's violation of the antitrust laws under the Sherman Act.  *See Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel*

---

[20] Separately, in a 2018 opinion on a motion to dismiss filed in a different case which stemmed from Koresko's scam and raised similar theories of RICO liability, this Court expressed skepticism that vicarious liability remained a valid theory of liability under Section 1962(c).  *See Hausknecht*, 334 F. Supp.3d at 682 n.15.

*Corp.*, 456 U.S. 556, 569 (1982) ["*Mechanical Engineers*"].  The beginning and lodestar for the analyses in both *Mechanical Engineers* and *Petro-Tech* was the *purpose* of the statute with courts interpreting said statute in a manner which "best served" or "honored" that purpose.  *Id.*; *Petro-Tech*, 824 F.2d at 1356.  Unless the statute expressly forbade the court's reading, the interpretation was permissible.  *See Petro-Tech*, 824 F.2d at 1356 ("We therefore hold that the doctrine of respondeat superior may be applied under RICO where the structure of the statute does not otherwise forbid it.").

Seven years after *Petro-Tech*, the Supreme Court considered whether aiding and abetting liability existed under the federal securities laws in *Central Bank* and ruled that it did not.  511 U.S. at 177.  Its reasoning was distinct from that of *Mechanical Engineers* and *Petro-Tech* in that it emphasized the text of the statute rather than its purpose.  *Id.* at 175-77.  Because the statute did not expressly provide a cause of action for aiding and abetting, or otherwise mention this breed of liability, the Court determined that it "does not itself reach those who aid and abet a [federal securities] violation."  *Id.* at 177.  In sharp contrast to the reasoning of *Mechanical Engineers* and *Petro-Tech*, the Court held that the purpose or policies underlying the statute "cannot override our interpretation of the text and structure of the Act."  *Id.* at 188.

The move from the method of interpretation in *Mehanical Engineers* and *Petro-Tech* versus that used in *Central Bank* can be found in the shifting tides of statutory interpretation. The earlier cases were decided  using a purposivist analysis which analysis sunk out of favor in the Supreme Court in the 1980s and 1990s while a different method of statutory interpretation, known as textualism, rose to the surface.  *See* Jonathan T. Molot, *The Rise and Fall of Textualism*, 106 Colum. L. Rev. 1, 23-25 (2006).  Textualism, unlike purposivism, cautions courts against "replac[ing] the actual text with speculation as to Congress' intent" counselling

them to "'presume more modestly' that the 'legislature says what it means and means what it says.'"  *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496-97 (2022).  Thus, textualism "begins with the statutory text", *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004), which can require exhausting "all the textual and structural clues" bearing on its meaning, *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018), and construing each word "in its context and in light of the terms surrounding it." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004).  Only where the text remains ambiguous does textualism permit consideration of other resources, such as legislative history or statutory purpose.  *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 537-542 (2015).  This latter method of statutory interpretation is now more prevalent in the Supreme Court's reasoning than it had been previously.  *See, e.g.*, *Oklahoma*, 142 S. Ct. at 2496-97.

Following the Court's decision in *Central Bank*, the Third Circuit reconsidered whether aiding and abetting liability existed under RICO, and twice concluded that it did not.  *See Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 656-57 (3d Cir. 1998), *abrogated on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000); *Pa. Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 843-45 (3d Cir. 2000) ["*Pa. Ass'n*"].  In both cases, the Third Circuit arrived at its conclusion by applying the reasoning in *Central Bank* and interpreting RICO through a textualist lens.  The Third Circuit explained that it was "convinced that a private cause of action for aiding and abetting a RICO violation cannot survive" *Central Bank* based on its analysis of statutory language.  *Pa. Ass'n*, 235 F.3d at 843.  Like *Central Bank*, the purpose or policy underlying RICO was of no concern: "the controlling issue is not whether imposing private civil liability on aiders and abettors is good policy but whether aiding and abetting is covered by the statute." *Id.* at 844 (internal citation and quotation marks omitted); *Rolo*, 155 F.3d at 657 ("[W]e must interpret and apply the law as Congress has written it, and not [] imply private causes of action

merely to effectuate the purported purposes of the statute." (internal citation and quotation marks omitted)).

Though *Petro-Tech*'s holding on aiding and abetting liability under RICO has been overruled, the viability of its holding on vicarious liability remains an open question as it has not been raised since the *Central Bank*, *Rolo*, *Pa. Ass'n.* trilogy of decisions.  It is evident, however, that *Petro-Tech*'s holding on vicarious liability is equally undermined by the reasoning found in that trilogy.  As with aiding and abetting, the text of RICO Section 1962 itself "does not in terms mention" vicarious liability, *Central Bank*, 511 U.S. at 175, nor does it contain any "indication that Congress intended to impose [vicarious liability] under RICO."  *Rolo*, 155 F.3d at 657. Indeed, while Section 1962(c) prohibits a person from "conduct[ing] or participat[ing], directly or indirectly" in a RICO violation, indirect participation does not encompass vicarious liability. The term "directly or indirectly" does not reach "persons who do not engage in the proscribed activities *at all.*" *Central Bank*, 511 U.S. at 176 (emphasis added).  Vicarious liability, however, extends to principals who did not themselves engage in the violation.  It thus exceeds the activity contemplated by an "indirect" RICO violation.  *Id.*; *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 255-56 (S.D.N.Y. 1997) (applying *Central Bank* to aiding and abetting liability under RICO Section 1962(c)).  The text of Section 1962(c) therefore does not support a private civil cause of action under a theory of vicarious liability, "in accordance with the policies articulated in *Central Bank*", and, taking into account the textualist approach, courts are generally proscribed from implying one.  *Rolo*, 155 F.3d at 657 (internal citation and quotation marks omitted).  Plaintiffs' Section 1962(c) vicarious liability claim therefore fails as a matter of law and Defendant's Motion for Summary Judgment on this claim shall be granted.

Plaintiffs' third RICO claim—for conspiracy under RICO Section 1962(d)—survives

summary judgment as Defendant does not make any viable arguments against this claim.

Instead, it points to the arguments raised in its briefing against Plaintiffs' 1962(c) claim, arguing

that, "Plaintiffs' Section 1962(d) claim must be dismissed for the same reasons that their section

1962(c) claims fails[*sic*]: Plaintiffs have failed to make any showing that Nationwide ever

conspired with any Koresko RICO violators or that Nationwide knowingly agreed to facilitate

Koresko's scheme to embezzle the loan proceeds."  But Defendant's Section 1962(c) arguments

do not address the following two elements of liability under Section 1962(d): "1) knowledge of

the corrupt enterprise's activities and 2) an agreement to facilitate those activities."  *Smith v.*

*Berg*, 247 F.3d 532, 535 (3d Cir. 2001) (internal citation and quotation marks omitted).

Defendant's defense against Plaintiffs' Section 1962(d) claim thus fails because it did not argue

it "in a manner that permits the court to consider its merits."  *United States v. Dupree*, 617 F.3d

724, 728 (3d Cir. 2010).  In making an argument, a party must "offer some argument or

development of its theory", "cite relevant precedents" and "frame the issues for decision."  *Id.*

(internal citation and quotation marks omitted).  This Court's role is not to craft arguments for

the parties, especially those represented by counsel.  *See Aliaj v. Att'y Gen.*, 387 F. App'x 136,

138 (3d Cir. 2010).

Defendant also argues that Plaintiffs' 1962(d) claim is untimely because by its

calculations the statute of limitations had run by either 2013 or 2016—well before Plaintiffs filed

this suit in August 2017.  Civil RICO claims are subject to a four-year statute of limitations

which begins to run when "plaintiffs knew or should have known of their injury."  *Mathews v.*

*Kidder, Peabody & Co.*, Inc., 260 F.3d 239, 250 (3d Cir. 2001) (citation omitted).  This standard

is "both subjective and objective."  *Id.*  The subjective component, *i.e.*, when "plaintiffs knew",

accrues "when the plaintiffs themselves discover their injuries."  *Id.*  The clock under the

objective component, *i.e.*, when "plaintiffs should have known", begins running when: (1) Defendant has shown the existence of "storm warnings" indicating the possibility of fraud," and, (2) the Plaintiff demonstrates that "they exercised reasonable diligence but were unable to find and avoid the storm." *See Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006). The Third Circuit has advised that the applicability of the objective prong "usually implicates factual questions as to when plaintiff discovered or should have discovered the elements of the cause of action" such that "defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Mathews*, 260 F.3d at 250 (internal quotation marks omitted) (quoting *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir. 1985)).  Defendant's "task is not an easy one." *Id.*

      Defendant has failed to carry its burden.  Defendant concedes that issues of fact preclude a determination as to whether Plaintiffs' claims are timely under the subjective standard.  It contends, however, that Plaintiffs' claim is untimely under the objective prong because there were "storm warnings" in the form of the Department of Labor's 2009 suit against the Koresko, a 2012 amendment of the complaint filed in that suit, and three articles published in 2009 which advertised the suit.  Defendant argues these "storm warnings" put Plaintiffs on notice of their claims in 2009 or 2012 and that they failed to exercise reasonable diligence to bring their claims. Plaintiffs counter that they *did* exercise reasonable diligence by regularly requesting information on the Policy from Koresko and his affiliates and the Defendant.  They, however, contend that they could not learn of the racketeering conduct which gave rise to the instant action because Koresko, his affiliates, and Defendant (at Koresko's and PPT's instruction) did not respond to Plaintiffs' requests for information about the Policy.  On these facts, there exists a genuine issue of material fact as to whether Plaintiffs exercised due diligence on their RICO claims, which

dispute must be left for the jury to resolve at trial.  *See, e.g.*, *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 417 F. Supp.2d 531, 551 n.18 (E.D. Pa. 2019) (holding that where plaintiffs demonstrate that there "was nothing they could do to learn of" defendant's misconduct, there exists a factual dispute for the jury).

IV.    **CONCLUSION**[21]

For the foregoing reasons, Plaintiffs' Motion shall be granted with respect to their Section 1132(a)(2) ERISA claim premised on the first change of ownership, and Defendant's Motion shall be granted with respect to Plaintiffs' RICO Section 1962(c) claims.  The Parties' cross-motions shall be denied in all other respects.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**
_____
**WENDY BEETLESTONE, J.**

---

[21] Defendant also asks the Court to "determine the amount of Plaintiffs' damages" at summary judgment, though it cites no authority to support the propriety of doing so at this juncture.  Accordingly, this Court declines Defendant's request for an opinion determining its potential liability if Plaintiffs were to succeed on their remaining claims.